# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01371-COA

**JOHN AARON NUNN A/K/A JOHN A. NUNN**           **APPELLANT**
**A/K/A JOHN NUNN**

**v.**

**STATE OF MISSISSIPPI**           **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/03/2021 |
| TRIAL JUDGE: | HON. MICHAEL PAUL MILLS JR. |
| COURT FROM WHICH APPEALED: | PRENTISS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: DANIELLE LOVE BURKS |
| DISTRICT ATTORNEY: | JOHN DAVID WEDDLE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/14/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., GREENLEE AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1. A Prentiss County grand jury indicted John Nunn for the "[sale], barter, transfer, manufacture, distribut[ion], or dispens[ation]" of more than two grams but less than ten grams of methamphetamine within 1,500 feet of a church. After a Prentiss County Circuit Court jury convicted Nunn of the indicted charge, the circuit court sentenced Nunn as a non-violent habitual offender to serve twenty-five years day for day in the custody of the Mississippi Department of Corrections (MDOC). On appeal, Nunn argues that the circuit court erred by failing to grant his request for a mental competency evaluation and by failing

to instruct the jury on entrapment. Finding no reversible error, we affirm.

**FACTS**

¶2.     Joey Clark, a narcotics officer with the Prentiss County Sheriff's Department, testified at Nunn's trial that Carissa Sasso, a confidential informant (CI), told him that she could purchase methamphetamine from Nunn. Clark stated that Sasso had indicated she could buy "an 8-ball," or "anywhere from 3.4 grams," of methamphetamine from Nunn. Sasso, who also testified at trial, stated that she was already at Clark's office when she received a Facebook message from Nunn about "trying to prostitute [her] out . . . ." Sasso testified that prior to receiving the Facebook message, she had met Nunn through a friend and had been to his residence several times. Sasso admitted that she had struggled with an addiction to crystal methamphetamine and at times had exchanged sex for drugs because of her addiction. Sasso denied, however, that she had ever had a sexual relationship with Nunn.

¶3.     According to Sasso, the topic of purchasing methamphetamine was mentioned during her communication with Nunn, and she asked Nunn about the purchase price of the methamphetamine. On cross-examination, Sasso testified that she never approached others about buying drugs. She instead stated that she only set up those individuals who first approached her and asked about selling her drugs. Based on her communications with Nunn, Sasso informed Clark that she thought she could successfully purchase drugs from Nunn.

¶4.     On January 3, 2018, Sasso met with Clark and Wesley Graves, a criminal investigator with the Prentiss County Sheriff's Department, at Clark's office to prepare to purchase drugs

2

from Nunn. After the officers inspected Sasso and her vehicle to ensure that she had no contraband in her possession, they wired Sasso with audio and video using a "button cam." Clark testified that he also issued Sasso $125 in official funds to make the drug purchase. Clark and Graves followed Sasso in an unmarked vehicle and parked in a church parking lot near Nunn's apartment. Sasso would later testify that she was not using drugs at the time of the January 3, 2018 drug purchase because she had just found out she was pregnant.

¶5.     While the two officers remained in the church parking lot, Sasso drove to Nunn's apartment. Just before she reached Nunn's apartment, Sasso called Clark on her cell phone. Clark muted the call and placed his phone on speaker to maintain an open line of communication with Sasso. Clark and Sasso both testified that Sasso entered Nunn's apartment, and Nunn then handed Sasso methamphetamine in exchange for the $125 Clark had given her. After some small talk with Nunn, Sasso exited the apartment, got into her vehicle, and drove back to the sheriff's department. Clark and Graves followed Sasso back to the sheriff's department, where Sasso gave them the drugs she had just purchased from Nunn.

¶6.     Clark immediately reviewed the video footage of the drug sale, which was admitted into evidence at trial. Clark testified that the footage captured "a good hand-to-hand transaction" of Nunn giving Sasso drugs in exchange for money. After reviewing the footage, Clark and Graves obtained Sasso's signed statement about the drug sale. Clark then paid Sasso $200 for her part in the transaction. The following day, Clark took the substance

3

Nunn had given Sasso to the crime laboratory. Analysis by the crime laboratory concluded that the substance was 3.03 grams of methamphetamine.

¶7. After the State rested its case-in-chief, Nunn testified on his own behalf. Nunn stated that he had met Sasso through his brother, who lived with him. Nunn also stated that Sasso had lived with him and his brother for a period of time before she moved out of their residence at the end of December 2017. According to Nunn, he and Sasso had used drugs together on a daily basis "[a]ll day, all night" when she lived with him and his brother. Nunn testified that he initially turned down Sasso's requests for methamphetamine because Sasso had told him that she was pregnant. Nunn further testified, however, that Sasso "kept on wanting to get high, so [he and his brother] started getting high with her." After Sasso moved out of his home, Nunn stated that she still came over and that they continued to use drugs together "[a]bout three or four times a week." Nunn admitted that he sometimes provided the drugs when he, his brother, and Sasso allegedly used them together. Nunn denied, however, that he initiated contact with Sasso, and he instead stated that she was the one who always contacted him.

¶8. With regard to the video footage from January 3, 2018, Nunn initially claimed that he and Sasso "were getting high" together and that the money Sasso had given him in the video was to reimburse him for rent he had paid on her behalf. Sasso had earlier testified, however, that at the time in question she had no bills because she was living with a friend and had a job. When the State cross-examined Nunn about his claim that the money was

4

reimbursement for a rent payment, he admitted that Sasso had not paid rent when she lived with him and his brother through the end of December 2017 but instead had been "staying there free."

¶9.     Later in his testimony, Nunn attempted to characterize the interaction with Sasso as a "trade" rather than a "sale."  Nunn admitted that he had a drug problem and had used methamphetamine prior to January 3, 2018.  Nunn also testified that he was on probation for a 2010 sale-of-cocaine conviction when he was charged with selling methamphetamine.  When asked whether he had violated his probation terms by selling methamphetamine to Sasso, Nunn denied that he had sold the methamphetamine to Sasso and instead explained that he had "trade[d]" the substance.  As Nunn described the arrangement, "on a fairly regular basis[,]" he and his brother gave Sasso "dope" in exchange for sex.  When the State cross-examined Nunn about whether he had therefore "transferred" or "distributed" methamphetamine, Nunn nodded his head in agreement.  Nunn later reiterated that his arrangement with Sasso "was sex for drugs, period."  After Nunn again testified about his alleged arrangement with Sasso, the State clarified, "So that's transferring meth.  You gave it to her for sex.  You've already said that."  Nunn once more responded affirmatively.

¶10.    After the parties rested, the jury deliberated and found Nunn guilty of the indicted charge.  The circuit court sentenced Nunn as a non-violent habitual offender to serve twenty-five years day for day in MDOC's custody.  On June 11, 2021, Nunn's trial attorneys filed a motion for a new trial, which was deemed denied by operation of law on July 12, 2021.  On

5

April 11, 2022, this Court granted Nunn's pro se motion for an out-of-time appeal.

## DISCUSSION

### I. Mental Competency Evaluation

¶11.   On appeal, Nunn contends that the circuit court erred by denying his request for a mental competency evaluation. Mississippi Rule of Criminal Procedure 12.1(a) provides that "a presumption of mental competency" exists and that "[t]he presence of a mental illness, defect, or disability alone is not grounds for finding a defendant incompetent to stand trial." As the defendant, Nunn "bears the burden to prove by substantial evidence that he . . . is mentally incompetent to stand trial." *Smith v. State*, 338 So. 3d 138, 140 (¶4) (Miss. Ct. App. 2022) (internal quotation mark omitted) (quoting *Pitchford v. State*, 240 So. 3d 1061, 1067 (¶32) (Miss. 2017)).  For a defendant "to be deemed mentally competent, [he] must have the ability to perceive and understand the nature of the proceedings, to communicate rationally with [his] attorney about the case, to recall relevant facts, and to testify in [his] own defense, if appropriate." MRCrP 12.1(a).

¶12.   Mississippi Rule of Criminal Procedure 12.2(a) provides that "[i]f at any time before or after indictment, the court, on its own motion or the motion of any party, has reasonable grounds to believe that the defendant is mentally incompetent, the court shall order the defendant to submit to a mental examination." As this Court has explained,

> [t]rial courts have the discretion to decide whether reasonable ground exists to believe a defendant is incompetent to proceed.  The relevant question is whether the trial judge received information which, objectively considered, should reasonably have raised a doubt about the defendant's competence and

6

alerted him to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense.

*Smith*, 338 So. 3d at 140 (¶6) (citations and internal quotation mark omitted).

¶13. Here, Nunn's trial attorneys filed a pre-trial motion and requested both a mental competency hearing and a psychiatric evaluation of Nunn. Nunn's trial attorneys argued that Nunn had "a history of mental[-]health treatment" and that the possibility existed Nunn was "unable mentally to control and appreciate the consequences of his actions and/or unable to assist in his legal defense."

¶14. During the hearing on the defense's motion, one of Nunn's trial attorneys appeared and submitted to the court a composite exhibit of Nunn's medical records. Based on the medical records, the attorney argued Nunn was mentally incompetent to stand trial because Nunn previously had received—and was still currently receiving—treatment from a "psychologist and/or psychiatrist"; had previously heard "voices in his head"; and had experienced "some issues with clinical depression in the past and with some severe episodes of posttraumatic stress disorder [(PTSD)] . . . ."

¶15. When questioned by the circuit judge, Nunn's trial attorney acknowledged that he had experienced no difficulty communicating with Nunn. The following exchange then occurred:

[Circuit Judge]: Is there anything specific that you can relate to the Court with regards to your interactions with Mr. Nunn that would cause you to believe that he is incompetent, Mr. Nails?

[Defense Attorney]: No, sir. Speaking from my own personal involvement

7

with Mr. Nunn and having spoken with him this morning and at other times, I personally cannot say that, no, sir.

[Circuit Judge]: Thank you. I'll ask the State and the defense: Aside [from] just my quick review of the first few pages, it appears that Mr. Nunn may be depressed, that he has several medical issues; however, none of this indicates to the Court that he is incompetent. If I am missing something here, could that please be pointed out to me, Mr. Nails?

[Defense Attorney]: No, sir, Your Honor, you are not missing anything. In fact, that was my [understanding] from looking at the records myself when they were provided to me.

[State's Attorney]: Your Honor, in reviewing all 75, 76 pages of records, the majority of which address Mr. Nunn's physical ailments, not mental health, there are in there references to a major depressive disorder and anxiety, a couple of times PTSD. However, all the notes indicate that his cognitive function was appropriate. His functional status was intact. In fact, the social worker that most of these are from . . . references his ability to communicate with her and appreciate what is going on in his life. There is nothing in these records that indicate that he cannot assist in his defense or that he is unable to understand the nature of the charges against him or anything that would lead to any type of incompetency or inability for Mr. Nunn to stand trial.

[Circuit Judge]: I tend to agree . . . . Mr. Nails, could you for the record inform the Court, to the best of your knowledge, how Mr. Nunn was able to arrive here today? Who gave him notice to be here? How did he -- in other words, you didn't pick him up at his house and bring him here today. He got here of his own free will?

[Defense Attorney]: No, sir. I didn't personally transport him here. [My co-counsel] had informed me yesterday that she had informed Mr. Nunn . . . yesterday to be here this morning

|  |  |
|---|---|
|  | and that he had had prior notice of the hearing that the Court intended to call up here. |
| [Circuit Judge]: | He had no issue getting here just based upon being provided notice to be here. Is that correct? |
| [Defense Attorney]: | To the best of my knowledge, no, sir, he had no problem finding the courthouse, finding his way upstairs to the courtroom[,] and finding a seat. |
| [Circuit Judge]: | Okay. Have you been able to speak to him about this particular charge in this cause, the facts involved? |
| [Defense Attorney]: | Briefly about the facts. More toward his mental condition and his mental [and] psychiatric treatment than the merits of the case. |

¶16. Following this exchange, the circuit judge stated that "[a]t this point in time" he would deny the defense's motion for a psychiatric evaluation of Nunn. The circuit judge revisited the issue of Nunn's mental competency on the first day of trial. Prior to voir dire, the circuit judge held a hearing in his chambers. As the circuit judge explained, he planned to question Nunn on the record because Nunn's trial attorneys had "made the Court aware in the presence of the district attorney's office that they [thought Nunn] might be impaired at the moment or under the influence . . . ."

¶17. In response to the circuit judge's questioning, Nunn confirmed that he was not under the influence of any illegal controlled substances or anything else that might cause impairment. Nunn explained to the circuit judge that he had taken only his prescribed PTSD medication for cravings as ordered by his doctor. Nunn told the circuit judge that he also had prescriptions for medication to treat insomnia and mental illness.

9

¶18. The circuit judge noted that Nunn appeared to understand the proceedings taking place and the charge against him for the sale of a controlled substance. Indeed, Nunn confirmed his understanding of the charge against him when questioned. The circuit judge then observed that he previously had met with Nunn about a year ago in open court and that Nunn "appear[ed] to be in the same manner today as he was a year or so ago."

¶19. After the circuit judge explained to Nunn the process of voir dire and jury selection, Nunn indicated that he had a question. Nunn then informed the circuit judge that he was "being tried as a habitual [offender] and had one felony from 2008 and '09 concurrent." Nunn further stated that in "2015 [he had not] been convicted, but [he had] been in prison for it already." In response, the circuit judge explained that the trial only addressed the currently indicted charge against Nunn and that Nunn's status as a habitual offender would be addressed as a separate matter. Nunn answered that he understood the circuit judge's explanation, and then he asked the circuit judge "about [his] requirements for veteran court treatment . . . ." The circuit judge stated that the issue was also one that would not be addressed during the present trial proceedings. After completing his questioning of Nunn, the circuit judge again concluded that Nunn was "fully aware of what's going on." As a result, the circuit judge denied the defense's request for further evaluation of Nunn's competency to stand trial.

¶20. Upon review, we find the circuit court's denial of Nunn's motion for a mental competency evaluation was not an abuse of discretion. On two separate occasions, the circuit

judge conducted a hearing to determine whether Nunn understood and appreciated the significance of the trial proceedings and had the ability to rationally aid in his defense. The record indicates that both times the defense failed to present evidence to overcome the presumption of Nunn's competency.

¶21. During the first hearing, one of Nunn's attorneys stated that he had spoken with Nunn about the facts of the case and Nunn's mental treatment. The attorney acknowledged that nothing in either his interactions or communications with Nunn had indicated Nunn lacked the competency to stand trial. The attorney further agreed with the circuit court's assessment that although the medical records indicated Nunn had dealt with several medical issues, nothing raised a doubt as to Nunn's mental competency. During the second hearing prior to voir dire, Nunn himself competently answered the circuit judge's questions regarding his medication and his understanding of the trial proceedings and the indicted charge against him. In addition, Nunn informed the circuit judge about his prior convictions, inquired about being tried as a habitual offender, and asked about his "veteran court treatment." Based upon such evidence, we find there was no reasonable ground for the circuit judge to believe that Nunn lacked the mental competency to stand trial to the extent of rising to an abuse of discretion. *See Smith*, 338 So. 3d at 140 (¶6).

## II.   Entrapment Jury Instruction

¶22. Nunn also asserts that the circuit court erred by failing to instruct the jury on the defense of entrapment. We review a trial court's decision to give or deny jury instructions

for abuse of discretion. *Bliss v. State*, 326 So. 3d 1000, 1005 (¶18) (Miss. Ct. App. 2021).

"We must read the jury instructions 'as a whole to determine if they were proper.'" *Id.*

(quoting *Pitts v. State*, 291 So. 3d 751, 757 (¶33) (Miss. Ct. App. 2020)). "If warranted by

the evidence, it is fundamental that a defendant is entitled to a jury instruction on his theory

of the defense." *Baker v. State*, 315 So. 3d 558, 563 (¶14) (Miss. Ct. App. 2021) (quoting

*Johnson v. State*, 749 So. 2d 369, 372 (¶10) (Miss. Ct. App. 1999)). "Where[, however,] the

given jury 'instructions fairly announce the law of the case and create no injustice, no

reversible error will be found.'" *Bliss*, 326 So. 3d at 1005 (¶18) (quoting *Pitts*, 291 So. 3d

at 757 (¶33)).

¶23.    "Whether the entrapment defense should be submitted to the jury depends upon

whether there is credible evidence in the record supporting such a defense. Our question then

is whether there was sufficient evidence in the record that a rational jury might have found

for the appellant on the entrapment issue." *Forrester v. State*, 971 So. 2d 649, 650-51 (¶4)

(Miss. Ct. App. 2007) (quoting *Walls v. State*, 672 So. 2d 1227, 1230 (Miss. 1996)). "Before

a defendant can raise the defense of entrapment, he or she is required to *show evidence of*

*government inducement* to commit the criminal act and a *lack of predisposition* to engage in

the criminal act prior to contact with government agents." *Turner v. State*, 276 So. 3d 1224,

1228 (¶12) (Miss. Ct. App. 2018) (quoting *Walls*, 672 So. 2d at 1230).

¶24.    Our caselaw explains that

> [s]tandard entrapment occurs when an innocent person with no prior criminal
> inclination is induced through persistent entreaties by undercover law

12

enforcement agents to commit an offense. Once the defendant produces evidence that he was induced by a government agent to commit the criminal act and that he did not have a predisposition to commit the criminal act, the burden shifts to the prosecution to produce evidence of predisposition[,] and the defendant is entitled to a jury instruction on entrapment.

*Forrester*, 971 So. 2d at 651 (¶4) (citations and internal quotation mark omitted). But "[i]f the defendant already possesses the criminal intent, and the request or inducement merely gave the defendant the opportunity to commit what he or she was already predisposed to do, entrapment is not a defense." *Turner*, 276 So. 3d at 1228 (¶12) (quoting *Walls*, 672 So. 2d at 1230).

¶25. Here, following the parties' arguments on Nunn's request for an entrapment jury instruction, the circuit court found that Nunn had failed to show his lack of a predisposition to commit the charged crime. In fact, based on Nunn's own testimony, the circuit court concluded Nunn had demonstrated his predisposition to commit the alleged act. As a result, the circuit court denied the defense's request to instruct the jury on entrapment. On appeal, Nunn argues the circuit court erred.

¶26. Relevant to Nunn's claim on appeal, we find our analysis in *Forrester* to be instructive. In *Forrester*, the jury convicted the defendant of selling cocaine, and on appeal, the sole issue focused on whether the circuit court had erred by failing to give a jury instruction on entrapment. *Forrester*, 971 So. 2d at 650 (¶1). Like Nunn, "Forrester argue[d] that the evidence show[ed] he was not predisposed to commit the crime prior to the inducement by law enforcement." *Id.* at 651 (¶5). In finding that the circuit court properly

13

refused to give Forrester's entrapment instructions, this Court noted that the following trial evidence belied Forrester's assertions on appeal:

> Forrester admitted that he had sold marijuana twenty-three years ago. Forrester admitted that he began using cocaine approximately six years prior to trial. Forrester admitted that he was the supplier when he and another unnamed friend frequently used drugs together. Forrester testified that no one forced him to purchase the cocaine and bring it to Weaver's [(a known cocaine addict who served as a confidential informant)] motel room. Forrester admitted that he and Weaver used drugs together once or twice a week[,] and it was common for one of them to buy the drugs. The record reflects that Weaver only called Forrester once on January 5th to ask him to bring her cocaine. Forrester admitted that he was willing to do what Weaver requested. Agent Scott testified that Forrester was not specifically targeted, rather Weaver was instructed to contact anyone she knew who sold drugs.

*Id.*

¶27. Similarly to Forrester's testimony, Nunn admitted that he had a prior conviction for selling drugs, that he frequently used drugs with Sasso and his brother, and that he sometimes supplied the drugs they used. Nunn also testified that he had an arrangement with Sasso to trade drugs for sex, and he agreed on cross-examination that he had therefore "transferred" or "distributed" methamphetamine to Sasso in exchange for sex. Nunn also stated that the interaction with Sasso on January 3, 2018, was another "trade" with Sasso where he transferred or distributed drugs to her in exchange for sex.

¶28. Nunn's indictment charged that he did "sell, barter, transfer, manufacture, distribute, or dispense . . . a quantity of two (2) grams or more but less than ten (10) grams" of methamphetamine within 1,500 feet of a church. Based on Nunn's own testimony, we agree with the circuit court's finding that Nunn failed to show a lack of predisposition to commit

14

the crime charged. Because Nunn failed to establish a prima facie case of entrapment, we find no abuse of discretion in the circuit court's decision to not instruct the jury on that particular defense.

## CONCLUSION

¶29. Upon review, we find no error in the circuit court's denial of Nunn's request for a mental competency evaluation or the court's decision to not give a jury instruction on entrapment. We therefore affirm Nunn's conviction and sentence.

¶30. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR.**